UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

         Plaintiff,

                                       Case No. 07-CV-14085
vs.                                HON. GEORGE CARAM STEEH

DAIRY FRESH FOODS, INC.,

         Defendant.

_____/

<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#22)</u>

Defendant Dairy Fresh Foods, Inc. moves for summary judgment of plaintiff Equal Employment Opportunity Commission's ("EEOC") claims filed on behalf of Charlie Taylor of a hostile work environment and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq..  A hearing on the motion was held on February 12, 2009.  For the reasons set forth below, Dairy Fresh's motion for summary judgment will be GRANTED.

**I. Background**

EEOC filed a federal complaint on behalf of Charlie Taylor on September 27, 2007, alleging Dairy Fresh violated Title VII by subjecting Taylor to a racially hostile work environment, and terminating Taylor on November 30, 2006 in retaliation for protesting against racial discrimination.  The record shows that Taylor, an African-American, began working for Dairy Fresh on October 2, 2006, as a warehouse worker.  Warehouse workers receive "picking slips" of a list of products, obtain cases of the listed products from the

warehouse shelves, load the cases onto pallets, and return the loaded pallets to a dock area where they are loaded onto trucks for shipment.  Warehouse workers also check the pallets for accuracy and sometimes load the trucks.  Although Dairy Fresh is a union employer, Taylor was a non-union probationary employee during his short tenure at Dairy Fresh.  This lawsuit arises from two incidents.

### A. November 12-13, 2006 Incident

As Taylor began the 7:30 p.m. night-shift on November 12, 2006, a little more than a month into his job, co-worker Omari Gill, also an African-American, told Taylor that warehouse worker Ken Lewis was referring to him as "Cornelius."  Taylor testified:

> A. [by Taylor] I heard Ken Lewis using the term ["Cornelius"], you know, openly around everybody and just around a bunch of peoples in the factory. I never really thought -- knew nothing of it.  So Omar walked up to me, he was like, "Man, you know when Ken Lewis be saying Cornelius, he be talking about you."
>
> I'm like, "Who in the hell is Cornelius?"
>
> He was like, "You know, that monkey off the Planet of the Apes."

Tr. at 169.  Taylor admitted that it wasn't until November 12, 2006 that he first learned that Lewis had been referring to him as "Cornelius."

Gill attests that he had overheard Lewis talking to Union Steward Charles Milner, an African-American, about someone named "Cornelius."  Gill did not know who "Cornelius" was, so he asked Milner.  Milner told Gill that Lewis referred to Taylor as "Cornelius," meaning an ape character from the Planet of the Apes movie.  After Gill "expressed to Milner that [he] thought it was wrong," Milner agreed, prompting Milner to consult Supervisor Matt Michels.  According to Taylor, Milner told Taylor that, when he reported the "Cornelius" reference to Supervisor Michels in the presence of another Supervisor, Kevin

2

Huber, Huber laughed and also referred to Taylor as "Cornelius."

Supervisor Michels testified that he first heard of the "Cornelius" comments when he talked with Milner on November 12, 2006.  Michels did not understand the racial reference until it was explained to him by Milner. Tr. at 44.  Michels spoke with Taylor after talking to Milner.  Michels testified that he was worried about a possible fight between Taylor and Lewis, but that Taylor appeared calm and not overly agitated.  Tr. at 46.  Taylor attests that: "I guess [Michels] was somewhere looking at me because he knew that I was kind of upset, so he came to me or whatever and he talked to -- he asked me a question. I say, 'It don't really' -- like I told him, I said, 'Ken Lewis, it don't really even matter because if he say it in front of my face, I ain't going to be responsible for my actions,' exact words." Tr. at 170-171.  According to Taylor, he was angry, causing Michels to respond: "Whatever you want to do, if you do it on this property, I got to call the police, but catch him up at the gas station." Tr. at 172.  Taylor admits that Michels "warned me about getting physical with Ken Lewis" on November 12, 2006.  Tr. at 152.  Michels told Taylor that the company was going to investigate the situation, then left to find Lewis.  Tr. at 47.

According to Michels, Lewis admitted referring to Taylor as "Cornelius," but explained that warehouse worker Paul Adams told him Taylor's name was "Cornelius." Tr. at 47.  Michels corrected Lewis, and told him that using the name "Cornelius" could be considered racially offensive.  Tr. at 48.  Michels also told Lewis that he would be talking the next day to Comptroller Jim Mrowka about the situation, noting the time to be around 4:00 a.m., near the end of the November 12, 2006 night-shift.  Tr. at 48.  Michels left Mrowka a voice-mail about the incident that night.  Tr. at 49.

The next day, November 13, 2006, at the beginning of the night-shift, Taylor met

Lewis at the time-clock area . Taylor, Tr. at 166.  Taylor testified that he confronted Lewis

because supervisors Michels and Huber "and anybody else did not do anything[.]"

> A. [by Taylor] . . . . I told them I wanted to try to get with somebody with their
> management.  They was like -- Charles Millender [Milner] was like, well, hey,
> nothing nobody can do in management because you ain't in a union, we can't
> even represent you.  I tried to tell them to go to Al Mrowka or whatever, there
> ain't nothing we can do.  I talked to -- the next day when we came in I talked
> to Charles before I even went to the time clock.  I was like, "well, you know,
> what happened?"
>
> He was like, "Well, there ain't nothing we could do because you not a
> union worker, so the union, I can't represent you in this situation." . . . .

Taylor Tr. at 173.  Taylor admits he stood an "arm length" away from Lewis and told him

"My name is Charlie, not Cornelius, and if you've got to disrespect me in this factory and

call me anything other than that, you ain't got to say nothing to me." Tr. at 64.  Taylor also

admitted that he was angry and raised his voice to Lewis, but could not remember if he

pointed in Lewis' face.  Tr. at 64.

Michels called Mrowka at home and described the confrontation.  Tr. at 65.  After

a lengthy discussion, Mrowka decided to discipline Lewis, suspending him for the

remainder of the shift without pay, and warning Lewis that any future work rule violations

would result in his discharge (Lewis was later discharged on May 20, 2006 for calling

another Union employee a "dumb-ass"; the discharge referenced the warning Lewis

received on November 13, 2006).  Taylor was not disciplined for the November 13, 2006

incident, but was warned, according to Taylor, that his confrontational conduct was

"grounds for termination."  Tr. at 184.  According to Taylor, Supervisor Michels told him:

"We sending Ken Lewis home for the rest of the night.  I'm letting you [Taylor] know that

if you ever do that again, we're firing you, you're not going to be working here no more[.]"

Tr. at 184.  According to both Mrowka and Taylor, Lewis did not again refer to Taylor as

"Cornelius."

## B. November 30, 2006 Incident

Taylor argues that, after the November 12-13, 2006 incidents, he was subjected to "different terms and conditions of employment" when he was assigned to work with warehouse worker Robert Stoll, a Caucasian, to clean Aisle C at the end of the shift. Taylor testified that Michels assigned Stoll to work with him because Stoll was always the last person to leave, requiring Taylor to stay until Stoll left at around 7:00 a.m.. Taylor Tr. at 149, 161.

Stoll testified that problems began on the first day. Tr. at 17. According to Stoll, he was "stuck" loading trucks when Taylor asked him to help clean Aisle C so they could both go home. Id. Taylor declined Stoll's invitation to first help Stoll load the truck. Id. Their problems escalated during the week because, according to Stoll, "it was everyday that he was complaining about me asking him to help load a truck and helping him clean the aisle." Id. Stoll testified regarding a November 30, 2006 incident:

Q. Okay, so after the first couple of days that you've told me about where you say that you -- it seemed like the two of you were able to work it out --

A. [by Stoll] Yes.

Q. -- what specifically was he doing or saying to you, you know, after that?

A. After that, it just slowly escalated till the end of the week. And then, at the end of the week, you're supposed to level your aisle, pull pallets. If you haven't kept your aisle up, you have to make sure you get whatever you didn't keep up with at the end of the week done.

    And I guess there was quite a bit to do. He seemed pretty upset about it. I ended up getting the last truck of the night. And Matt [Michels], to help me out, instructed a fellow named Tim to give me a hand so we can get the truck done and get the truck out by its time to leave.

    And [Taylor] started circling and yelling profanity such as: You dumb son

5

of a bitch.  Why don't you hurry the fuck up?  Get your ass in here.

   And I confronted Matt [Michels] and said Matt, would you please instruct him that I have to get this truck done.  It has to leave by a certain time.  We have all night to get that aisle done.  This truck has to leave by this time.

*          *          *

Q.  Okay.  What specifically do you recall [Taylor] saying to you?

A. That this is bullshit.  Get your ass in the aisle.  Other profanity remarks that I can't really, really -- you know, it was a long night, to say the least.  At the very end of the night, though, he approached me, and I thought he was going to hit me or do something -- you know how you have that comfort zone where if somebody comes in at you, you take two steps back?  I felt as if he entered that zone to hurt me, so I took two steps forward with my back to him, and that's when I seen Mr. Matt [Michels] come out of the dock adjacent to us.

*          *          *

Q.  Okay.  So this time that he approached you, you said you felt that he was --

A.  Was going to assault me.

*          *          *

Q.  And describe to me exactly how he approached you that gave you that impression?

A.  A 3,000 pound pallet jack going 3 miles an hour stopping inches from my back and him jumping off of it and moving quickly at me.

*          *          *

Q.  Was he saying anything to you upon approaching you at that point?

A.  He was saying something in regards to: This is fucking bullshit.  All week long I'm stuck with you -- da da da da da.

Stoll, Tr. at 17-21.

   Stoll had complained to Supervisor Michels about 10-20 minutes earlier that "Taylor

was being very vulgar towards [Stoll], almost in a threatening manner, sometimes in a

threatening manner a lot of times throughout the whole week."  Michels Tr. at 64, 66.

Michels testified that "I counseled [Taylor] about threatening and being very vulgar and

abusive towards Robert Stoll.  I told him that was not tolerated.  He needed to stop, stay

in his aisle, or he could be discharged."  Id. at 65-66.  Even though Michels counseled

Taylor, he later found Taylor walking out of his work area.  Id. at 65.   Michels overheard

the incident described by Stoll, and escorted Taylor to the office.  Id. at 66; Stoll, Tr. at 24.

According to Michels: "I told [Taylor] you're being -- you're disobeying direct orders, you're

threatening -- you're being intimidating towards other employees, you're discharged.  Then

he started yelling at me and calling me names."  Id.

Taylor denies being counseled by Michels, and could not remember whether he

cursed at Stoll or Michels.  Tr. at 190, 198.  Taylor attested to his belief that he was fired

for soliciting written statements from co-workers as "some kind of documented proof that

this did happen between me and Ken Lewis[.]"  Tr. at 214.  Taylor proffers an unsworn

statement written by warehouse worker Brian Harrell in which Harrell writes that Lewis

called Taylor "Cornelius" "at least 10 times."  Taylor attests that Harrell told him that he,

Harrell, was fired because Harrell thought Michels saw him sign the statement.  Tr. at 220.

## II. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary

judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  See

Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The standard for determining

whether summary judgment is appropriate is "'whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## A. Hostile Work Environment

To succeed on a Title VII claim of a hostile work environment, the plaintiff must prove: (1) he is a member of a protected class; (2) he was subjected to harassment; (3) the harassment was based on race; (4) the harassment created a hostile work environment; and (5) employer liability. Ladd v. Grand Trunk Western RR, Inc., No. 07-2512, --- F.3d ---, 2009 WL 77908, *4 (6th Cir. Jan. 14, 2009) (citing Williams v. General Motors Corp., 187 F.3d 553, 561 (6th Cir. 1999)). The harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working

environment'[.]" Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  In determining whether the alleged harassment is sufficiently severe or pervasive to support a Title VII claim, courts must consider the totality of the circumstances, with the court "review[ing] the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility." Williams, 187 F.3d at 563.  Courts have recognized that "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment." Jackson v. Quanex Corp., 191 F.3d 647, 661 (6th Cir. 1999) (quoting Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d. Cir. 1997)).

To be actionable, the alleged harassment must be severe or pervasive enough to create both an objectively and subjectively hostile work environment. Williams, 187 F.3d at 566.  Under the objective component, a reasonable person must be able to find that the work environment was racially hostile or abusive. Id.  Applying the subjective standard, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Id.

To establish employer liability for a hostile-work-environment arising from a non-supervisory co-workers actions, the plaintiff must show that the employer "knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action." Williams, 187 F.3d at 561 (quoting Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir. 1999)).  "[T]he standard 'is one of failure-to-correct-after-notice or duty to act after knowledge of harm.'" Id. (quoting Fleenor v. Hewitt Soap Co., 81 F.3d 48, 50 (6th Cir. 1996)).

It is beyond dispute that Taylor first learned from Gill and Michels on November 12, 2006 that Lewis was referring to him as "Cornelius," and that the name was being used in reference to "that monkey off the Planet of the Apes."  Taylor Tr. at 169.  It follows that Taylor cannot prove that Lewis' use of the name "Cornelius" prior to November 12, 2006 exposed Taylor to a subjectively hostile work environment.  Williams, 187 F.3d at 566; Matsushita Elec., 475 U.S. at 587; Redding, 241 F.3d at 532.  "Events of which [the] Plaintiff had no knowledge cannot support a hostile environment claim, because a person cannot perceive an act as hostile if he is not aware of its existence."  Norris v. City of Anderson, 125 F.Supp.2d 759, 768-69 (D.S.C. 2000) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Harrell's unsworn statement that he overheard Lewis refer to Taylor as "Cornelius" "at least 10 times" prior to November 12, 2006, Darrell Jenkins' attestations[1] that he was told by "other employees" that Lewis had been referring to Taylor as "Cornelius" since Taylor was hired on October 6, 2006, and Taylor's testimony that he had heard Lewis use the name "Cornelius" prior to November 12, 2006, do not displace Taylor's unequivocal testimony that he first learned that Lewis was referring to him as "Cornelius" on November 12, 2006.

The parties dedicated considerable argument to the issue of whether Lewis' use of the name "Cornelius" alone was objectively hostile or abusive.  EEOC relies on Green v. Franklin National Bank of Minneapolis, 459 F.3d 903 (8th Cir. 2006) in which a panel of the Eighth Circuit properly recognized that calling an African-American fellow employee a "monkey" is widely accepted as actionable racial harassment.  Id. at 911.  Here, Taylor did not find Lewis' use of the term "Cornelius" to be racially hostile (asking Gill "Who in the hell

---

[1]  Counsel for the EEOC withdrew Jennings' Affidavit (Exhibit H) at the hearing.

is Cornelius?") until Gill explained it to him on November 12, 2006. Taylor Tr. at 169. Gill

himself did not realize that the name "Cornelius" could be viewed as racially abusive until

Milner explained the alleged reference to Gill. Milner learned of the alleged meaning of the

term "Cornelius" from Brian Harrell on November 12, 2006, and believed it was "just a one-

day thing." Tr. at 82. Supervisor Michels testified that he first heard of Lewis' "Cornelius"

comments on November 12, 2006, and that he did not understand the racial reference until

it was explained to him by Milner. Lewis denied any underlying racial meaning. Supervisor

Huber's alleged laughter as Milner explained the situation to Supervisor Michels does not

reasonably imply that Huber drew a racial connection to the term "Cornelius" prior to

Milner's November 12, 2006 explanation of the name. The use of the term "monkey" in

Green is not equivalent to the use of the term "Cornelius" here absent the additional

explanation that "Cornelius" was allegedly used by Lewis in reference to "that monkey off

the Planet of the Apes." Reviewing the work environment as a whole, and in a light most

favorable to EEOC and Taylor, Lewis' use of the name "Cornelius" alone, without the

November 12, 2006 racial explanation first provided by Harrell to Milner, then Milner to Gill,

and ultimately Gill to Taylor, could not have created an objectively hostile work environment

prior to November 12, 2006. Williams, 187 F.3d at 563, 566; Matsushita Elec., 475 U.S.

at 587; Redding, 241 F.3d at 532.

It is beyond reasonable dispute that Dairy Fresh first learned of the offensive use of

the name "Cornelius" on November 12, 2006. Supervisor Michels and Comptroller Mrowka

took prompt action beginning on November 12, 2006, with Michels counseling Lewis that

day and leaving a voice-mail for Mrowka at 4:00 a.m.. Michels and Mrowka disciplined

Lewis the next day, November 13, 2006, by sending Lewis home without pay and issuing

Lewis a "last-chance" warning after Taylor confronted Lewis.  It is undisputed that Lewis never again used the name "Cornelius," or otherwise contributed to a racially hostile environment.  A timely company reprimand that stops the offensive conduct is sufficient to relieve an employer of Title VII liability.  Fleenor, 81 F.3d at 51.  EEOC's argument that the only appropriate action that could be taken by Dairy Fresh was to fire Lewis on the spot is unpersuasive on this record.   Lewis was under a September 26, 2005 last-chance agreement for calling another employee "stupid" and threatening to give the employee a "knuckle sandwich," not for prior racial harassment.  Michels' belief that Dairy Fresh's "zero tolerance" policy with respect to race discrimination meant "if you are found guilty of racial discrimination, a proven event, you will be discharged" is consistent with Lewis' denial that he used the name "Cornelius" in a racial manner; Lewis told Michels he believed Taylor's name was in fact "Cornelius."

EEOC's argument that Mrowka only got involved after Taylor confronted Lewis does not support a finding that Dairy Fresh failed to act promptly.  Michels called Mrowka at 4:00 a.m. on November 12, 2006 after first learning of the incident, roughly three hours before the shift ended.  Mrowka presumably arrived at work on the morning of November 13, 2006, well after Lewis and Taylor had already left the warehouse.  In short, Taylor confronted Lewis at the start of the November 13, 2006 shift, before Mrowka was given a reasonable time to "get involved."  Union Steward Milner's alleged statements that "nothing nobody can do in management because you ain't in a union, we can't even represent you" as a probationary employee cannot be attributed to Dairy Fresh.

Construing the pleadings and evidence in a light most favorable to EEOC and Taylor, reasonable jurors could not conclude that Dairy Fresh knew or should have known

of the alleged racial harassment and failed to take prompt and appropriate corrective action. Williams, 187 F.3d at 561; Fleenor, 81 F.3d at 50; Matsushita Elec., 475 U.S. at 587; Redding, 241 F.3d at 532. Dairy Fresh is entitled to summary judgment of Taylor's hostile work environment claim as a matter of law. Id; Amway Distributors, 323 F.3d at 390.

## B. Retaliatory Discharge

To establish a prima facie case of retaliation, the Title VII plaintiff must prove: (1) he was engaged in protected activity; (2) the defendant had knowledge of this protected conduct; (3) the defendant took an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Ladd, 2009 WL 77908, at *5 (citing Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 523 (6th Cir. 2008)). In rare circumstances, temporal proximity alone may be sufficient to prove element four of the prima facie case, a causal connection. Mickey, 516 F.3d at 525-26. After demonstrating a prima facie case, the defendant employer has the burden of producing evidence of a non-discriminatory reason for the adverse employment action. Ladd, 2009 WL 77908, at *5 (citing Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007)). If the employer meets this burden, the plaintiff employee has the burden of producing evidence demonstrating that the employer's proffered reason is a mere pretext for discrimination. Id. To show pretext, the plaintiff must produce evidence that the proffered reason: (1) has no factual basis; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant the adverse action. Id. at *6 (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).

EEOC and Taylor have failed to proffer evidence that Taylor was engaged in

protected activity and that Dairy Fresh had knowledge of the protected activity. Taylor's confrontation with Lewis in the time-clock area on November 13, 2006 is not conduct protected by Title VII. See Cruz v. Coach Stores, 202 F.3d 560, 566 (2nd. Cir. 2000) (recognizing that Title VII does not protect acts of physical violence in opposing unlawful discrimination); Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d 222, (1st. Cir. 1976) (recognizing that Title VII does not permit employees to achieve proper objectives through improper means). Taylor's testimony that Harrell told him he thought Michels saw him signing a written statement regarding Lewis' use of the term "Cornelius" falls short of establishing that Taylor solicited the statement, much less that Michels knew Taylor had solicited the statement. Taylor's assertion that he was assigned to work with Stoll as an adverse employment action because Stoll always worked late, requiring Taylor to also work until 7:00 a.m., is not supported by the proffered time records. See Defendants' November 24, 2008 Reply Brief, Exhibit K. Under the undisputed circumstances of this case, the temporal proximity between the November 12-13, 2006 incident and Taylor's November 30, 2006 discharge is insufficient to reasonably infer a causal connection between the incidents. Mickey, 516 F.3d at 525-26. Reasonable persons could not conclude on this record that EEOC and Taylor have proven a prima facie case of retaliation. Ladd, 2009 WL 77908, at *5; Matsushita Elec., 475 U.S. at 587; Redding, 241 F.3d at 532.

Even assuming proof of a prima facie case, EEOC and Taylor have not come forward with evidence to rebut Dairy Fresh's evidence that Taylor was fired for his repeated confrontations with Stoll. Mickey, 516 F.3d at 525-26. Taylor does not deny his poor relationship with Stoll, or his final November 30, 2006 encounter with Stoll. Taylor only

denies being counseled by Supervisor Michels, and simply testified that he could not remember whether he cursed at Stoll or Michels.  Taylor does not dispute that he was warned following the November 13, 2006 incident with Lewis that his confrontational conduct was grounds for termination, and that if he ever did it again, he would be fired. Reasonable jurors could not find on this record that the reason for Taylor's discharge, his continuing altercations with Stoll leading up to the final incident on November 30, 2006, had no basis in fact, did not actually motivate Dairy Fresh's decision, or was insufficient to warrant Taylor's discharge.  Ladd, 2009 WL 77908, at *5; Matsushita Elec., 475 U.S. at 587; Redding, 241 F.3d at 532.  Dairy Fresh is entitled to summary judgment of Taylor's retaliatory discharge claim as a matter of law.  Id; Amway Distributors, 323 F.3d at 390.

## C. After-Acquired Evidence Doctrine

The court notes that, had Taylor's claims survived summary judgment, Taylor's remedy would have been limited to recovering backpay from December 1, 2006 to January 15, 2008.  Under the after-acquired evidence rule, if an employer demonstrates that it would have been entitled to terminate an employee for severe wrongdoing if it had known of the wrongdoing at the time, the employee's Title VII remedies for discrimination are limited.  Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160, 1168 (6th Cir. 1996) (citing McKennon v. Nashville Banner Publishing Co., 115 S.Ct. 879, 886-87 (1995)).  The after-acquired evidence doctrine generally bars the employee from recovering front pay and reinstatement, and limits backpay from the time the employer discovered the wrongdoing. Id. at 1168 (citing McKennon, 115 S.Ct. at 886).

It is beyond dispute that Taylor misrepresented in his September 21, 2006 Dairy Fresh employment application that he had never been convicted of a crime.  Taylor was

15

in fact convicted in Detroit Recorders Court on March 6, 1989, of the felony of assault with

intent to do great bodily harm less than murder, M.C.L. § 750.84, and was sentenced to five

to ten years imprisonment.  Taylor also failed to disclose his last place of employment to

Dairy Fresh, Quality Touch, Inc., even though the application expressly stated that the

"Employment History MUST BE COMPLETE."  Id.  Taylor was fired from Quality Touch,

Inc. "due to a theft incident at Valyssis [sic] in which he was caught on office video

surveillance removing property that din [sic] not belong to him from the offices he was

cleaning." Affidavit of Quality Touch, Inc. owner Daryl Drew.  Dairy Fresh first learned of

Taylor's criminal record on January 15, 2008.  Taylor's remedy would have been limited by

the after-acquired evidence doctrine as a matter of law.  Thurman, 90 F.3d at 1168; Amway

Distributors, 323 F.3d at 390.

### III. Conclusion

For the reasons set forth above, defendant Dairy Fresh's motion for summary

judgment is hereby GRANTED.  EEOC's Title VII claims alleged on behalf of Charlie Taylor

are hereby DISMISSED in their entirety.

SO ORDERED.

Dated:  May 29, 2009

> s/George Caram Steeh
> GEORGE CARAM STEEH
> UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 29, 2009, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

---